***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a pre-trial agreement at the deputy commissioner hearing as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The appointment of any party who appears in a representative capacity is valid and no additional proof of appointment or capacity shall be required.
4. An employee-employer relationship existed between plaintiff and defendant-employer.
5. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
6. Royal and Sunalliance was the carrier on the risk on August 16, 1999.
7. Plaintiff sustained a compensable injury arising out of her employment on August 16, 1999.
8. A Form 33 Request that Claim be Assigned for Hearing was filed by plaintiff on February 19, 2001.
9. A Form 33R was filed by defendant on May 2, 2001.
10. Plaintiff's average weekly wage at the time of her injury was $357.60.
11. The parties stipulated into evidence medical records labeled Stipulated Exhibit #1 consisting of 252 pages including the deposition of Richard W. Adams, M.D.
12. Stipulated Exhibit #2 consisting of plaintiff's answers to defendant's interrogatories was initially stipulated into evidence. However, at the time of the hearing, there was no verification from plaintiff and plaintiff could not remember answering the interrogatories. The parties were instructed at hearing to offer verification or Stipulated Exhibit #2 would not be made a part of the evidentiary record. No verification has been received following the hearing; therefore, Stipulated Exhibit #2 is not a part of the evidentiary record in this matter.
13. Issues to be determined by the Commission are:
 a. Whether plaintiff is entitled permanent and total disability as a result of the July 16, 1999 injury?
b. Whether plaintiff is entitled to temporary total disability?
c. Whether plaintiff is entitled to permanent partial disability?
 d. Whether plaintiff is entitled to reimbursement for all medical expenses incurred.
 e. Whether plaintiff is entitled to reimbursement for all mileage incurred as a result of necessary medical treatment?
 ***********
Based upon all of the evidence of record and any reasonable references, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, born in El Salvador, is predominately Spanish speaking. Plaintiff was 58 years old at the time of the hearing and had completed the fourth grade. Plaintiff's employment history includes manual labor work operating machines and as an egg catcher in chicken houses.
2. Plaintiff began working for defendant-employer in approximately August or September 1998, 1 year prior to her August 16, 1999 injury by accident. Plaintiff first worked putting rolls of yarn onto the machines.
3. In December 1998, plaintiff complained of back pain to plant nurse Linda Franklin after bending and lifting cones of yarn. Plaintiff was seen by Dr. Seagle and was initially put on light duty. However, plaintiff missed no time from work. At some point after this incident but prior to August 16, 1999, plaintiff was provided back support.
4. After the December 1998 episode of back pain, while plaintiff was working as a heat set operator, another incident occurred when plaintiff's shirt was caught in a buggy and the buggy struck plaintiff on the left side of her back. Plaintiff was seen at Piedmont Health Care and thereafter occasionally requested Ibuprofen or Tylenol but missed no time from work.
5. On August 16, 1999, plaintiff entered the bathroom, slipped on the wet tile floor and fell hitting her buttocks, back and arms when attempting to break the fall. Plaintiff indicates that she felt pain in her back immediately.
6. Immediately following the fall, co-workers and the company nurse, Linda Franklin came to plaintiff's assistance. Plaintiff complained to Ms. Franklin of left elbow and shoulder pain only. Ms. Franklin took plaintiff to her office and provided plaintiff with ice and Ibuprofen for pain. Ms. Franklin did not observe plaintiff having any difficulty walking. Plaintiff rested in the break room for approximately an hour. Thereafter, plaintiff returned to work and finished her shift that day and continued working for approximately 3 and one half months until December 1999.
7. Donna Jordan, who was plaintiff's co-worker on August 16, 1999 and later plaintiff's supervisor, observed plaintiff enter the bathroom immediately before the fall. The bathroom door closed behind plaintiff and when Ms. Jordan entered the bathroom, plaintiff was sitting on the floor. Ms. Jordan checked on plaintiff who appeared alert and requested help from Rocky who was filling-in for supervisor Paul Shore. Ms. Jordan saw plaintiff the next day and thereafter approximately one time per week and did not notice plaintiff having difficulty walking.
8. On August 17, 1999, the day after plaintiff fell, plaintiff returned to work and Ms. Franklin saw her at the beginning of the shift. Plaintiff complained of a sore left shoulder and a bruise on her elbow. Plaintiff made no mention of back pain. Ms. Franklin did not learn of the severity of plaintiff's back complaints until December 6 or 7, 1999 when plaintiff had been out of work for approximately a week.
9. At the time of her August 1999 fall, plaintiff was a winding extra who helped process. Plaintiff's continued her job duties after the August 1999 injury under the supervision of Paul Shore. These duties included removing 3 pound bobbins from spinning and placing them on pegs at winding. After one side of a rack was filled with bobbins, plaintiff pushed and flipped the two-sided rack to continue filling it. Plaintiff's job called for bending and twisting as well as over-head reaching and stretching. Plaintiff performed these duties from August 16, 1999 until December 1999 without observable difficulty. Plaintiff did however complain of shoulder and arm pain after the fall when asked by Mr. Shore.
10. While plaintiff continued to work at her regular employment, she occasionally requested and was given Ibuprofen for pain by Ms. Franklin.
11. Plaintiff first sought treatment for back pain on December 2, 1999 from physician's assistant Michael Cevasco. Plaintiff indicated that she had fallen in August 1999 and 2 weeks prior to her visit. Plaintiff complained of left-sided back pain and was treated conservatively. However, when plaintiff did not improve, a CT scan was performed on December 3, 1999 that was interpreted by the radiologist as revealing a fractured right facet at the L5 level, a broad based protrusion at the L5-S1 level and moderate stenosis at the L4-L5 level. No other diagnostic test confirms this interpretation of a fractured facet. Furthermore, there has been no treatment rendered for a fractured facet.
12. Plaintiff was seen on December 14, 1999 by Dr. Jeffrey Kuhlman, board certified orthopedic surgeon, upon referral of defendant-employer. Plaintiff presented with left-sided complaints and provided a history of falling in the bathroom at work in August 1999. Plaintiff indicated that all of her pain had been on the left side with pain occasionally running down her leg. Plaintiff indicated that she had experienced similar episodes with the last being approximately a year earlier. Dr. Kuhlman who personally reviewed the December 3, 1999 CT scan disagreed with the radiologist's interpretation and found no fracture of the facet or herniation but rather degenerative arthritis. Dr. Kuhlman explained that a CT scan because of its method of cross plane cuts can falsely indicate a fracture if the cut passes through the bottom of one facet and the top of another. Therefore, an MRI is a better tool to determine that there is no fracture line. Plaintiff's physical exam revealed tenderness of the lower left back and a negative straight leg test as well as normal reflexes and strength. Dr. Kuhlman diagnosed a back contusion and recommended keeping plaintiff on light duty. Plaintiff was given an injection and medication. Dr. Kuhlman did not feel that further diagnostic tests were necessary at this time.
13. Plaintiff returned to Dr. Kuhlman on January 7, 2000. The injection was successful in alleviating plaintiff's left-sided complaints. However, plaintiff began complaining of right-sided pain with possible radiculopathy. Therefore, plaintiff's right lower back was injected.
14. Thereafter, plaintiff returned to full duty work and reported to Dr. Kuhlman on January 21, 2000 that she was improved with a little stiffness occasionally in the mornings. Plaintiff also reported a little numbness in her leg to Dr. Kuhlman's nurse. However, plaintiff had no significant complaints. Plaintiff was given home exercise and instructed to return as needed.
15. On February 29, 2000, approximately a month after her last visit plaintiff returned to Dr. Kuhlman with complaints of severe pain in the right leg and right buttock with electricity type feelings running all the way down the leg. This pain was much more clearly radicular in nature according to Dr. Kuhlman who felt an MRI was necessitated by plaintiff's new complaints. Dr. Kuhlman could not relate plaintiff's complaints on February 29, 2000 to her August 16, 1999 fall.
16. On March 9, 2000, an MRI was performed which did not reveal a facet fracture, disc herniation or significant stenosis and confirmed the earlier opinion of Dr. Kuhlman. On March 20, 2000, Dr. Kuhlman reviewed the MRI and found a signal abnormality at L3, L4 L5, probably hemangioma. In order to rule out other disease processes such as cancer, Dr. Kuhlman ordered a bone scan but felt all complaints were unrelated to plaintiff's fall in August 1999. Therefore, Dr. Kuhlman prescribed Ultram and released plaintiff on March 27, 2000 when the bone scan revealed no abnormality.
17. On April 17, 2000 plaintiff was referred by Mr. Cevasco to a physiatrist, Jerome T. Watson, M.D. Plaintiff provided a history of the August 16, 1999 fall indicating that she hit her bottom, back and elbows. Plaintiff indicated that she had experienced pain running into her right leg since the time of the fall. This history is inconsistent with prior medical records which indicated that plaintiff's complaints after the August 1999 fall were on her left side. Dr. Watson saw plaintiff for continued complaints on April 19 and April 24, 2000 and continued conservative treatment as plaintiff was previously scheduled for a pain program at Davis Hospital.
18. Plaintiff was again seen by Dr. Watson on May 8, 2000 and complained of continued pain in her right hip. Plaintiff reported attempting to work two days but discontinuing work because of severe pain.
19. On May 26, 2000, approximately 9 months after plaintiff's fall, she presented to Dr. Richard W. Adams for continued complaints of pain in her low back and right hip and leg. Plaintiff had a positive right straight leg raise test at 30 degrees. Due to the severity of the pain, Dr. Adams admitted plaintiff to the hospital for further evaluation. On May 31, 2000, a second MRI was performed which did not reveal any herniation or stenosis but did reveal bulging discs at L4-L5 and L5-S1. In a June 20, 2000 medical note, Dr. Adams confirmed the radiologist's interpretation, stating that the protruding disc previously seen on the December 3, 1999 CT scan is not prominent on the May 2000 MRI, which is consistent with the results of the March 2000 MRI.
20. On June 30, 2001, in an attempt to locate the source of plaintiff's right leg radiculopathy, Dr. Elizabeth A. Wright performed a nerve conduction test. Despite plaintiff's continued complaints of pain radiating into her right leg, the test revealed no indication of radiculopathy, plexopathy, neuropathy or myopathy.
21. Additional diagnostic tests were performed on July 27, 2000 including a lumbar myelogram and a CT scan of the lumbar spine. The myelogram did not reveal any abnormalities and the CT scan revealed a stable degenerative disc bulge and facet arthritis at the L5-S1 level, with no evidence of a facet fracture or herniations and no significant stenosis.
22. On December 11, 2000, the same battery of tests was performed. At which time, the CT scan revealed bilateral facet arthritis with grade I spondylolisthesis along with a broad based disc protrusion at the L5-S1 level. Also, a less severe disc bulge was revealed at the L4-L5 level.
23. After conservative treatment failed, in April 2001, Dr. Adams performed a laminectomy at the L4-L5 level with a multi level fusion of the L4-L5 and L5-S1 levels. Since that time, plaintiff has returned to Dr. Adams for follow up treatment. However, as of the date of hearing, plaintiff had not reached maximum medical improvement.
24. According to Dr. Adams, plaintiff's August 16, 1999 fall aggravated plaintiff's pre-existing degenerative disc condition and caused further protrusion of the bulging discs placing further pressure on the nerve roots and eventually resulting in plaintiff's surgery.
25. However, Dr. Watson and Dr. Kuhlman disagree with Dr. Adams' opinion regarding causation. Dr. Watson indicated that bulging or disc protrusion is not typically caused or exacerbated by the type of fall described by plaintiff. Dr. Kuhlman corroborated Dr. Watson's opinion. Furthermore, Dr. Kuhlman felt that although plaintiff may have experienced a temporary exacerbation of her pre-existing degenerative arthritis as a result of her fall, the resultant symptoms resolved and returned to the initial baseline with in three to six months of plaintiff August 16, 1999 fall at a maximum. For that reason, as of February 29, 2000, Dr. Kuhlman opined that plaintiff's condition was no longer worsened or aggravated by the August 16, 1999 fall and that her right-sided complaints ultimately resulting in surgery were unrelated to plaintiff's August 16, 1999 fall. Dr. Kuhlman felt that the August 16, 1999 fall did not aggravate or exacerbate any protruding discs or cause any further pressure on nerve roots as there was no indication of these conditions during the time that he treated plaintiff.
26. The testimony of Dr. Adams is afforded less weight than that of Dr. Kuhlman and Dr. Watson. In particular, Dr. Kuhlman contemporaneously reviewed plaintiff symptoms, her physical condition and the objective test results in closer proximity to plaintiff's August 16, 1999 fall. Therefore, Dr. Kuhlman was in a better position to treat and diagnose plaintiff as well as to determine the issue of causation with regard to plaintiff's fall. To the extent that Dr. Adams related plaintiff's treatment including her April 2001 surgery to the August 16, 1999 injury by accident, his opinion is based in part on an incomplete history. Furthermore, unlike Dr. Kuhlman, Dr. Adams did not have the advantage of treating plaintiff at an earlier date in her recovery. Dr. Adams also testified that his opinion concerning causation is predicated on the finding that the CT Scan taken in December 1999 revealed that plaintiff had a fractured facet as a result of her August 1999 fall. The Commission accepts Dr. Kuhlman's explanation that the CT Scan was misread and thereby rejects Dr. Adams' opinion on causation. In addition, the negative MRI and EMG taken in spring 2000 in contrast with the positive December 2000 studies indicates that the condition of plaintiff's spine changed during this period.
27. Plaintiff suffers from degenerative disc disease in her lower back that was temporarily exacerbated by the August 16, 1999 fall, which resulted in mainly left-sided pain and a contusion. The greater weight of the evidence indicates that plaintiff did not suffer a facet fracture. The period of the exacerbation of plaintiff's pre-existing condition resolved as of February 29, 2000.
28. As a result of the temporary exacerbation of plaintiff's pre-existing back condition, plaintiff missed time from work beginning in approximately December 1999 and plaintiff was also on light duty at times. However, plaintiff continued to attempt to work until May 2000. Anytime plaintiff was incapable of earning wages after February 29, 2000 is unrelated to her August 16, 1999 injury.
 ***********
Based upon the foregoing findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. As a result of the August 16, 1999 injury by accident, plaintiff sustained a temporary aggravation of her pre-existing degenerative back condition, which resolved by February 29, 2000. N.C.G.S. § 97-2(6).
2. Plaintiff has failed to prove by the greater weight of the evidence that her condition including any disability or medical treatment after February 29, 2000 is related to the August 16, 1999 injury by accident. N.C.G.S. § 97-2(6).
3. Plaintiff is entitled to temporary total disability to the extent that she was unable to earn the same or greater wages for any period beyond the seven-day waiting period as a result of her injury by accident beginning August 16, 1999 and continuing until February 29, 2000. N.C.G.S. §§ 97-28; 97-29.
4. Plaintiff is entitled to all reasonably necessary medical expenses for treatment, including medications, related to her August 16, 1999 injury by accident, which tend to effect a cure, provide relief or lessen the period of disability until February 29, 2000 when her condition had resolved, and no further. N.C.G.S. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability to the extent that she was unable to earn the same or greater wages for any period beyond the seven-day waiting period beginning August 16, 1999 and continuing until February 29, 2000, subject to a reasonable attorney's fee. As this amount has accrued, it shall be paid in one lump sum.
2. Defendants shall pay all reasonably necessary medical expenses for treatment related to plaintiff's August 16, 1999 injury by accident, which tend to effect a cure, provide relief or lessen the period of disability until February 29, 2000 and no further.
3. An attorney's fee in the amount of twenty-five percent (25%) of the compensation due plaintiff is hereby allowed to be paid directly to plaintiff's counsel.
4. Defendants shall bear the costs of this action due the Commission and shall pay all experts witness fees, if not already paid.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER